## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS WALSH, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EMC CORPORATION, JOSÉ E. ALMEIDA, MICHAEL W. BROWN, DONALD J. CARTY, RANDOLPH L. COWEN, JAMES S. DISTASIO, JOHN R. EGAN, WILLIAM D. GREEN, EDMUND F. KELLY, JAMI MISCIK, PAUL SAGAN, LAURA J. SEN, JOSEPH M. TUCCI, DELL INC., and UNIVERSAL ACQUISITION CO.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 15-13654<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### CLASS ACTION COMPLAINT FOR
### BREACH OF FIDUCIARY DUTIES

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of EMC Corporation ("EMC" or the "Company") against EMC and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on October 12, 2015 (the "Proposed Transaction"), pursuant to which EMC will be acquired by Dell Inc. ("Parent") and its wholly-owned subsidiary, Universal Acquisition Co. ("Merger Sub," and together with Parent, "Dell").

2.      On October 12, 2015, the Board caused EMC to enter into an agreement and plan

of merger (the "Merger Agreement").   Upon completion of the Proposed Transaction, stockholders of EMC will receive approximately $33.15 per share in cash and stock.   In particular, pursuant to the Merger Agreement, EMC stockholders will receive: (i) $24.05 in cash (the "Cash Consideration"), and (ii) approximately 0.111 shares of "tracking stock" of VMware, Inc. ("VMware"), which is 81% owned by EMC, for each share of EMC they own (the "Stock Consideration," and together with the Cash Consideration, the "Merger Consideration").

3.        The Proposed Transaction was the result of conflicts of interest on the part of the Company's Chairman and Chief Executive Officer ("CEO"), Joseph M. Tucci ("Tucci"), who sold the Company to reap approximately $27.2 million in change of control payments, which he otherwise would not have received if Tucci retired as planned.   Certain members of the Board, moreover, suffer from conflicts of interest and allowed Tucci to sell the Company, rather than insist the Company be sold off in parts.   Indeed, according to an analyst at FBR & Company, "many EMC shareholders will likely argue breakup value is in the $35-$38/share range and we strongly agree."   As one analyst summed the Proposed Transaction: "I think it's a great deal for Dell.  I think it's a terrible deal for shareholders, consumers and Boston."

4.        In short, the Proposed Transaction is the product of a flawed process and deprives EMC's public stockholders of the ability to participate in the Company's long-term prospects.   In approving the Merger Agreement, the Individual Defendants breached their fiduciary duties to Plaintiff and the Class (defined herein).   Moreover, as alleged herein, EMC and Dell aided and abetted the Individual Defendants' breaches of fiduciary duties.

5.        Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  The Company is incorporated in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of EMC common stock.  Plaintiff is a citizen of Pennsylvania.

10.     Defendant EMC is a Massachusetts corporation and maintains its principal executive offices at 176 South Street, Hopkinton, MA 01748.  The Company, an information technology company, focuses on enabling businesses and service providers to transform their operations.  EMC's common stock is traded on the NYSE under the ticker symbol "EMC."

11.     Defendant José E. Almeida ("Almeida") has served as a director of EMC since January 2015.  According to the Company's website, Almeida is a member of the Leadership

and Compensation Committee and the Finance Committee.  Upon information and belief, defendant Almeida is a citizen of Massachusetts.

12.     Defendant Michael W. Brown ("Brown") has served as a director of EMC since August 2005.  According to the Company's website, Brown is a member of the Audit Committee and Chair of the Finance Committee.  Upon information and belief, defendant Brown is a citizen of Washington.

13.     Defendant Donald J. Carty ("Carty") has served as a director of EMC since January 2015.  According to the Company's website, Carty is a member of the Audit Committee and the Corporate Governance and Nominating Committee.  Upon information and belief, defendant Carty is a citizen of Texas.

14.     Defendant Randolph L. Cowen ("Cowen") has served as a director of EMC since January 2009.  According to the Company's website, Cowen is Chair of the Leadership and Compensation Committee and a member of the Mergers and Acquisitions Committee.  Upon information and belief, defendant Cowen is a citizen of New York.

15.     Defendant James S. DiStasio ("DiStasio") has served as a director of EMC since March 2010.  According to the Company's website, DiStasio is Chair of the Audit Committee and a member of the Corporate Governance and Nominating Committee.  Upon information and belief, defendant DiStasio is a citizen of Massachusetts.

16.     Defendant John R. Egan ("Egan") has served as a director of EMC since May 1992.  According to the Company's website, Egan is a member of the Finance Committee and Chair of the Mergers and Acquisitions Committee.  Upon information and belief, defendant Egan is a citizen of Massachusetts.

17.      Defendant William D. Green ("Green") has served as a director of EMC since

July 2013 and Lead Director since February 2015.  According to the Company's website, Green is a member of the Leadership and Compensation Committee and the Mergers and Acquisitions Committee.  Upon information and belief, defendant Green is a citizen of Massachusetts.

18.     Defendant Edmund F. Kelly ("Kelly") has served as a director of EMC since August 2007. According to the Company's website, Kelly is a member of the Finance Committee.  Upon information and belief, defendant Kelly is a citizen of Massachusetts.

19.     Defendant Jami Miscik ("Miscik") has served as a director of EMC since August 2012.  According to the Company's website, Miscik is Chair of the Corporate Governance and Nominating Committee.   Upon information and belief, defendant Miscik is a citizen of New York.

20.     Defendant Paul Sagan ("Sagan") has served as a director of EMC since December 2007. According to the Company's website, Sagan is a member of the Leadership and Compensation Committee.   Upon information and belief, defendant Sagan is a citizen of Massachusetts.

21.     Defendant Laura J. Sen ("Sen") has served as a director of EMC since September 2015.  Upon information and belief, defendant Sen is a citizen of Massachusetts.

22.     Defendant Tucci has served as a director of EMC since January 2001.  According to the Company's website Tucci has been CEO since January 2001, Chairman of the Board since January 2006, and President since February 2014.  Tucci is a member of the Finance Committee and the Mergers and Acquisitions Committee.  Upon information and belief, defendant Tucci is a citizen of Massachusetts.

23.     The defendants identified in paragraphs eleven through twenty-two are collectively referred to herein as the "Individual Defendants."   By virtue of their positions as

directors and/or officers of EMC, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public stockholders of EMC.

24.     Each of the Individual Defendants at all relevant times had the power to control and direct EMC to engage in the misconduct alleged herein.  The Individual Defendants' fiduciary obligations required them to act in the best interest of plaintiff and all EMC stockholders.

25.     Each of the Individual Defendants owes fiduciary duties of loyalty, good faith, due care, and full and fair disclosure to plaintiff and the other members of the Class.  The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

26.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

27.     Defendant Parent is a Delaware corporation with its corporate headquarters located at 1 Dell Way, Round Rock, TX 78682.

28.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the other public stockholders of EMC (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other

entity related to or affiliated with any defendant.

30.     This action is properly maintainable as a class action.

31.     The Class is so numerous that joinder of all members is impracticable.  As of June 30, 2015, there were approximately 1,924,726,357 shares of EMC common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

32.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants have breached their fiduciary duties owed to plaintiff and the Class and/or aided and abetted such breaches; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

33.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

34.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

35.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

36.    EMC is a global leader in enabling businesses and service providers to transform their operations and deliver information technology as a service (ITaaS).  Fundamental to this transformation is cloud computing.  Through innovative products and services, EMC accelerates the journey to cloud computing, helping IT departments to store, manage, protect, and analyze their most valuable asset – information – in a more agile, trusted, and cost-efficient way.

37.    EMC works with organizations around the world, in every industry, in the public and private sectors, and of every size, from startups to the Fortune Global 500.  The Company's customers include global money center banks and other leading financial services firms, manufacturers, healthcare and life sciences organizations, Internet service and telecommunications providers, airlines and transportation companies, educational institutions, and public sector agencies.

38.    EMC's differentiated value stems from its sustained and substantial investment in research and development, a cumulative investment of $20.7 billion since 2005.  To strengthen its core business and extend its market to new areas, EMC has invested $16 billion in acquisitions over the same period and has integrated more than 75 technology companies.

39.    EMC is supported by thousands of technical R&D employees around the globe, the industry's broadest portfolio of systems, software, and services, its ability to create total integrated solutions, and its commitment to delivering the best Total Customer Experience in this or any industry.  In 2014, EMC customers awarded the Company its highest net promoter score ever recorded, and its service excellence was recognized by distinguished awards for Innovation in Customer Commitment and Innovation in Enabling Customer Success from the Technology Services Industry Association.

40.     The Company operates R&D centers in Brazil, China, France, India, Ireland, Israel, the Netherlands, Russia, Singapore, and the U.S., and manufacturing facilities in the U.S. and Ireland.   EMC holds the most stringent quality management certification from the International Organization for Standardization (ISO 9001), and its manufacturing operations hold an MRP II Class A certification.

41.     EMC ranks 128 in the Fortune 500 and had reported revenues of $24.4 billion in 2014, the largest revenue year in EMC's 35-year history.

42.     EMC employs approximately 70,000 people worldwide.   The Company is represented by approximately 400 sales offices and scores of partners in 86 countries around the world.   It has the world's largest sales and service force focused on information infrastructure, and it works closely with a global network of technology, outsourcing, systems integration, service, and distribution partners.

43.     The Company is poised for future growth and success.

44.     On July 22, 2015, EMC issued a press release wherein it announced its second quarter 2015 financial results.  The Company reported that GAAP revenue was up 2% year over year and non-GAAP revenue was up 3% (up 8% on a constant currency basis) year over year. EMC also reported that EMC Information Infrastructure revenue was up 1% year over year (up 6% on a constant currency basis), and Emerging Storage revenue was up 49% year over year – led by XtremIO, Isilon, and Software-Defined Storage.

45.     With respect to the financial results, Individual Defendant Tucci, EMC Chairman and CEO, said:

> While pleased with many aspects of the second quarter, especially with the market acceptance and rapid growth of our newer products, we also saw customers become more conservative around refreshing their traditional infrastructures as they plan their IT transformations. We also saw ongoing geo-

political factors in China and Russia. To capture more opportunity we have honed our growth strategy around four pillars: best-in class products and solutions that are, or will be, offered as a service; an expanded focus on cloud services; tighter coordination of our federated go-to-market approach; and a leadership team that is second to none. We are confident in our strategy in becoming the most trusted partner to customers embarking on digital transformation and hybrid cloud journeys, and we remain laser focused on enhancing shareholder value.

46.    Zane Rowe, EMC's Chief Financial Officer, stated:

My thanks to the entire team for their hard work and execution in the second quarter. We are seeing success in the growth areas of our portfolio, while our traditional storage category was impacted by customers focusing on their short-term purchasing needs as they develop their digital agendas. We continue to drive growth, cost efficiency and business transformation, as well as additional alignment across our businesses.

47.    Additionally, David Goulden, CEO of EMC Information Infrastructure, commented:

In an IT market that is changing rapidly, our new businesses are performing exceptionally well, with the Emerging Storage business now at nearly a $3 billion revenue run-rate, which we expect will grow more than 30% in 2015. We are focused on evolving our storage portfolio, delivering solutions, leading in high-growth areas and getting more aggressive on costs and are taking additional steps to manage the trends in our traditional storage business. Going forward, the favorable mix toward new applications and transformational spend will serve us well beyond 2015.

### The Inadequate Proposed Transaction and Deal Protection Provisions

48.    Despite the Company's prospects for future growth and success, the Board caused the Company to enter into the Merger Agreement, pursuant to which EMC will be acquired by Dell for inadequate consideration.

49.    Upon completion of the Proposed Transaction, stockholders of EMC will receive approximately $33.15 per share in cash and stock.  Pursuant to the Merger Agreement, EMC stockholders will receive: (i) $24.05 in cash, and (ii) a number of shares of common stock of Parent designated as Class V Common Stock, equal to the quotient obtained by dividing

(A) 222,966,450 by (B) the aggregate number of shares of Company common stock issued and outstanding immediately prior to the effective time, plus cash in lieu of any fractional shares. The Stock Consideration equates to approximately 0.111 shares of VMware, which is nearly impossible to value.

50.    The aggregate number of shares of Class V Common Stock issued as Merger Consideration in the transaction is intended to represent 65% of the Company's economic interest in the approximately 81% of the outstanding shares of VMware currently owned by the Company, reflecting approximately 53% of the total economic interest in the outstanding shares of VMware.  Upon completion of the transaction, Parent will retain the remaining 28% of the total economic interest in the outstanding shares of VMware.

51.    To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Dell and are calculated to unreasonably dissuade potential suitors from making competing offers.

52.    For example, despite a limited go shop period, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 4.02 of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 4.02(b) of the Merger Agreement states, in relevant part:

> (b) Except as expressly permitted under Section 4.02(a), from the date of this Agreement the Company agrees that neither it nor any of its Subsidiaries shall, and the Company shall cause its and its Subsidiaries' Representatives not to, directly or indirectly through another person, (i) solicit, initiate or knowingly encourage, or knowingly facilitate or knowingly induce, the making of any Acquisition Proposal, or the making of any inquiry, offer or proposal that would

reasonably be expected to lead to, any Acquisition Proposal, (ii) enter into, facilitate, continue or otherwise participate or engage in any discussions or negotiations regarding, or furnish to any person any information or data or afford access to the business, directors, officers, employees, properties, facilities, assets, contracts, books or records of the Company or any of its Subsidiaries to any person in connection with any Acquisition Proposal, (iii) enter into any agreement relating to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement prior to the No-Shop Period Start Date or in accordance with this Section 4.02(b)), (iv) waive, terminate, modify or fail to enforce any provision of any "standstill" or similar obligation of any person (other than Parent) with respect to the Company or any of its Subsidiaries (unless the Company concludes in good faith, after consultation with its outside legal advisors, that the failure to so waive, terminate, modify or fail to enforce would be inconsistent with its fiduciary duties under applicable Law), (v) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation, or any restrictive provision of any applicable anti-takeover provision in the Company Articles or Company Bylaws, inapplicable to any transactions contemplated by any Acquisition Proposal or (vi) authorize any of, or commit or agree to do any of the foregoing. . . .

53.     Further, pursuant to Section 4.02(e) of the Merger Agreement, the Company must advise Dell, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 4.02(e) of the Merger Agreement states:

(e) In addition to the obligations of the Company set forth in clauses (a), (b), (c) and (d) of this Section 4.02, after the No-Shop Period Start Date the Company shall as promptly as practicable (and in any event within 24 hours after receipt) notify Parent orally and in writing of any Acquisition Proposal (other than an Acquisition Proposal received prior to the No-Shop Period Start Date which was withdrawn prior to the No-Shop Period Start Date), such notice to include the identity of the person making such Acquisition Proposal and a copy of such Acquisition Proposal, including draft agreements or term sheets, financing commitments and other related documents submitted in connection therewith (or, where no such copy is available, a reasonably detailed written description of such Acquisition Proposal), including any material modifications thereto. Following the No-Shop Period Start Date, the Company shall (x) keep Parent reasonably informed in all material respects of the status and details (including any change to the terms thereof) of any Acquisition Proposal and (y) provide to Parent as soon as reasonably practicable after receipt or delivery thereof copies of all correspondence and other written material sent or provided to the Company or any of its Subsidiaries from any person that describes any of the terms or

conditions of any Acquisition Proposal. The Company shall not, and shall cause the Company's Subsidiaries not to, enter into any Contract with any person subsequent to the date of this Agreement that prohibits the Company from providing such information or the information contemplated by the last sentence of Section 4.02(a) to Parent or otherwise limits or impairs the Company's or its Subsidiaries' or Representatives' ability to comply with their respective obligations in this Section 4.02.

54.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Dell a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 4.02(d) of the Merger Agreement provides, in relevant part:

(d) Notwithstanding anything to the contrary contained herein, the Board of Directors of the Company shall not be entitled to exercise its right to make a Change of Recommendation and the Company shall not be entitled to terminate this Agreement under Section 7.01(d)(ii) unless (i) the Company has complied in all material respects with this Section 4.02, (ii) the Company promptly notifies Parent, in writing, at least five (5) Business Days before taking that action, of its intention to take such action (which notification shall specify the details of the event giving rise to the Change of Recommendation and, if applicable, the identity of the person making an Acquisition Proposal that was determined to constitute a Superior Proposal and the material terms thereof, together with copies of any written offer or proposal, proposed definitive agreement, proposed or committed financing documentation and any other related documents in respect of such Acquisition Proposal), (iii) during such five (5)-Business Day period, if requested by Parent, the Company and its Representatives shall meet and engage in good faith negotiations with Parent and its Representatives to amend the terms and conditions of this Agreement in such a manner as would permit the Board of Directors of the Company or the Company to not take such actions, and (iv) following the end of such five (5)-Business Day period, the Board of Directors of the Company shall have determined in good faith, after consultation with its outside legal advisors, and taking into account any changes to the terms of this Agreement proposed by Parent following any notice provided pursuant to this Section 4.02(d) or otherwise, that the failure to take such action would continue to be inconsistent with its fiduciary duties under applicable Law and, in the case of a Change of Recommendation in response to an Acquisition Proposal or termination under Section 7.01(d)(ii), after consultation with a financial advisor of nationally recognized reputation, that the Acquisition Proposal giving rise to such notice continues to constitute a Superior Proposal; provided, however, that if (A) the Company receives an Acquisition Proposal pursuant to which the Board of

Directors of the Company determines in good faith, after consultation with its outside legal advisors and a financial advisor of nationally recognized reputation, that, if consummated, would result in the holders of Company Common Stock receiving consideration valued at 115% or more of the Merger Consideration (measured as the cash or fair market value of the applicable consideration), and (B) the Board of Directors of the Company determines that such Acquisition Proposal constitutes a Superior Proposal, then the requirements of this Section 4.02(d) shall not apply to such Acquisition Proposal, any amendment thereof or any new Acquisition Proposal from such person meeting the requirements set forth in clause (A) of this proviso; provided, further, that any amendment to the financial terms or other material terms or conditions (including the provision of financing) of the Acquisition Proposal which was determined to constitute a Superior Proposal (other than an Acquisition Proposal described in clause (A) of the foregoing proviso) shall require a new written notification from the Company and an additional two (2)-Business Day period that (other than as to the five (5) Business Day time periods set forth herein) satisfies this Section 4.02(d).

55.     Further locking up control of the Company in favor of Dell is Section 7.03 of the Merger Agreement, which contains a provision for a two-tier "Company Termination Fee."  If the Merger Agreement is terminated after the conclusion of the go-shop period, the Company must pay Dell *$2.5 billion*.  If the Merger Agreement is terminated prior to the conclusion of the go-shop period, the Company must pay Dell $2 billion.  Further, the Company may be required to pay Dell up to $50 million in expenses if the Merger Agreement is terminated.

56.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

57.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

58.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

59.     As a result, defendants have breached their fiduciary duties that they owe to the Company's public stockholders because the stockholders will not receive adequate or fair value for their EMC common stock in the Proposed Transaction.

***Tucci Refused to Break Up the Company and Refused to Retire***

60.     To the detriment of the Company's stockholders, Tucci refused to break up the Company's business to unlock value for the Company's stockholders.   As one analyst and former EMC employee put it:  "[Tucci] built EMC into what it is.  This is his baby, and he didn't want to see it get ripped apart."   Another analyst stated that Tucci viewed EMC "almost as one of his kids."

61.     On October 8, 2014, Elliott Management Corporation ("Elliott"), an activist EMC stockholder, wrote a letter to the Board stating that the Company's structure was "obscur[ing] enormous value" for stockholders.   Elliott advocated for the sale of VMware from EMC, followed by the sale of the rest of the Company.   To thwart Elliott's efforts to break up the Company to unlock stockholder value, Tucci caused the Company to enter into a standstill agreement, whereby Elliott was permitted to appoint Ameida and Carty to the Board.

62.     Tucci also refused to retire as planned.   As early as 2009, Tucci stated that he planned to retire in 2012.   In January 2012, Tucci stated that he would retire in 2013, but in September 2012, Tucci stated that he would retire in February 2015.   Again, in January 2015, Tucci backtracked and refused to retire, ostensibly because he knew a sale of the Company was inevitable and he would be guaranteed change in control benefits, which he otherwise could not realize if he retired.

63.     As summed by one analyst at FBR Capital Markets: "I don't think [Tucci] wanted to go out in a bad way by being forced into a breakup.  This way, [Tucci was] able to put a bow

around his career."

***The Proposed Transaction is the Result of Conflicts of Interest***

64.     As a result of the Proposed Transaction, Tucci will receive approximately $27 million in compensation, as opposed to the approximately $123,636 that Tucci would have received by retiring as he repeatedly promised he would do.  Aside from pecuniary gains, Tucci received another benefit as a result of the Proposed Transaction: he was able to keep his legacy and pride intact by preventing the breakup of the Company under his watch.  Now, Dell will be able to reap the benefits of a breakup of EMC, and not EMC's public stockholders.

65.     Further, the Company's investment banker in connection with the Proposed Transaction, Evercore Partners, has recently earned substantial fees from Dell in connection with Dell's recent going-private transaction.  Another advisor to the Board, Morgan Stanley, has acted as financier to Dell in the past, financing billions of dollars in transactions involving Dell.

66.     As a result of these conflicts of interest, the sale of the Company was tilted in favor of Dell to the detriment of the Company's public stockholders.

## COUNT I

**(Breach of Fiduciary Duties against the Individual Defendants)**

67.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

68.     As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of EMC's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance EMC's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public stockholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such

conflicts exist, to ensure that all conflicts are resolved in the best interests of EMC's public stockholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of EMC; and (f) disclose all material information to the Company's stockholders.

69.     The Individual Defendants have breached their fiduciary duties to plaintiff and the Class.

70.     As alleged herein, the Individual Defendants have initiated a process to sell EMC that undervalues the Company.  In addition, by agreeing to the Proposed Transaction, the Individual Defendants have capped the price of EMC at a price that does not adequately reflect the Company's true value.  The Individual Defendants also failed to sufficiently inform themselves of EMC's value, or disregarded the true value of the Company.  Furthermore, any alternate acquiror will be faced with engaging in discussions with a management team and Board that are committed to the Proposed Transaction.

71.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class.

72.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

**(Aiding and Abetting the Board's Breaches of Fiduciary Duties
Against EMC and Dell)**

73.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

74.     Defendants EMC and Dell knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Transaction, EMC provided, and Dell obtained, sensitive non-public information concerning

EMC and thus had unfair advantages that are enabling it to pursue the Proposed Transaction, which offers unfair and inadequate consideration.

75.     As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining fair consideration for their EMC shares.

76.     Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to plaintiff and the Class;

D.     Directing defendants to account to plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: October 27, 2015                    By his attorneys,


                                           */s/ Edward F. Haber*
                                           Edward F. Haber (BBO# 215620)
                                           Adam M. Stewart (BBO#661090)
                                           SHAPIRO HABER & URMY LLP
                                           Seaport East
                                           Two Seaport Lane
                                           Boston, MA 02210
                                           (617) 439-3939
                                           ehaber@shulaw.com
                                           astewart@shulaw.com

                                           Seth D. Rigrodsky
                                           Brian D. Long
                                           Gina M. Serra
                                           Jeremy J. Riley
                                           RIGRODSKY & LONG, P.A.
                                           2 Righter Parkway, Suite 120
                                           Wilmington, DE 19803
                                           (302) 295-5310

                                           *Attorneys for Plaintiff*